# EXHIBIT A

**Declaration of Gregory J. Phillips**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FIRSTENERGY CORP., et al. | ) | CASE NO. 1:20-cv-01966 |
| | ) | |
| Plaintiffs, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | |
| v. | ) | |
| | ) | **DECLARATION OF GREGORY J.** |
| MICHAEL PIRCIO, | ) | **PHILLIPS** |
| | ) | |
| Defendant. | ) | |

Pursuant to 28 U.S.C. §1746, Gregory J. Phillips declares as follows:

1. I am over the age of eighteen and submit this Declaration in support of FirstEnergy Corp.'s ("FirstEnergy") Response to the Court's Order to Show Cause dated March 8, 2021 (EFC No. 31).

2. I make this Declaration based on my own personal knowledge and review of records over which I am a custodian. If called as a witness, I could and would testify competently to the facts stated herein.

3. I am a partner with the law firm Benesch, Friedlander, Coplan & Aronoff LLP. I currently serve as Vice Chair of the firm's Litigation Department and Chair of its Business Litigation Practice Group. I am also a member of the firm's Risk and Ethics Committee, which, among other functions, counsels the firm's lawyers on matters of professional responsibility. Prior to joining Benesch in 2015, I was a partner at Ulmer & Berne LLP and the firm's General Counsel. From 2011 until 2018, I was a member of the CMBA's Certified Grievance Committee. For a number of years, I also served on the CMBA's Ethics and Professionalism Committee. I have been practicing law since 1998 (including the past seventeen years in Ohio) without being sanctioned or subject to disciplinary proceedings.

4. On August 28, 2020, FirstEnergy retained me to represent it in connection with a data breach that a third-party consultant, Clearsulting LLC ("Clearsulting"), had recently reported to FirstEnergy. Over the next four days, I led a team of lawyers at Benesch who, with input from counsel representing Clearsulting, prepared the Complaint (ECF No. 1) and Motion for Temporary Restraining Order and Preliminary Injunction ("Motion for TRO") (ECF No. 2) filed on September 1, 2020 with the Court.

5. As I came to understand the facts, which were substantiated by the Declaration of Monica Engelhardt (ECF No. 2-3) ("Engelhardt Decl.") and Affidavit of Laura E. Mollenshott ("Mollenshott Aff.") (ECF No. 2-2) filed in support of the Motion for TRO, the data breach resulted from the deliberate theft of documents by a former employee of Clearsulting, Michael Pircio, in the hours after the termination of his employment. Specifically, Ms. Engelhardt, a Director of Clearsulting, confirmed that:

> At approximately 9:55 a.m., on July 30, 2020, Clearsulting terminated Defendant's employment, both verbally and in writing.
>
> After Clearsulting terminated Pircio's employment, Pircio unlawfully accessed Clearsulting's computer, without authorization, and downloaded FirstEnergy's proprietary and confidential information from an internet-based SharePoint site, including but not limited to internal control processes, payment procedures, and sensitive employee and vendor financial information.

(Engelhardt Decl. ¶¶ 17-18.)

6. Ms. Mollenshott, the Manager, Financial & Shared Services Auditing at FirstEnergy Service Company, confirmed that the information taken by Mr. Pircio included highly-sensitive information about FirstEnergy's employees, including a list of employees' salaries. (Mollenshott Aff. ¶ 20.a.) Ms. Mollenshott also confirmed that Mr. Pircio obtained "full descriptions" of FirstEnergy's payment processes as well as very granular details about FirstEnergy's accounting

controls for such processes.  (Mollenshott Aff. ¶¶ 20.h-j.)  The information taken by Mr. Pircio included the personal identifiable information ("PII") of certain individuals, namely their names, addresses, and social security numbers, triggering notification requirements for FirstEnergy under three states' laws.

7. As argued in the Motion for TRO, the threat of irreparable harm to FirstEnergy arose from the possibility that Mr. Pircio would disseminate FirstEnergy's confidential information to a competitor or a criminal actor.  (ECF No. 2-1 at 4.)

8. Critically, Ms. Engelhardt also explained that the information taken by Mr. Pircio included "several work papers that Clearsulting prepared to test FirstEnergy's controls." (Engelhardt Decl. ¶ 19.)  As she elaborated, "[t]he work papers … describe the tests Clearsulting performed as well as Clearsulting's conclusion on the controls' operating effectiveness. In each case, Clearsulting's work papers validated that FirstEnergy's controls were functioning as designed and were effective to achieve Sarbanes-Oxley compliance." (*Id.*)  I and others on my team at Benesch reviewed the documents before filing the Complaint, and we saw nothing to cause us to doubt Ms. Engelhardt's analysis.

9. Ms. Engelhardt's testimony, which remains unrebutted, has heavily influenced my view of the case and the merits of Mr. Pircio's putative whistleblower defense from the outset.  Far from evidencing accounting irregularities or a securities law violation, the work papers stolen by Mr. Pircio showed the opposite:  they uniformly validated the design of FirstEnergy's accounting controls and provided independent, expert confirmation of FirstEnergy's compliance with Sarbanes-Oxley.

10. On August 30, 2020, I called Mr. Pircio's lawyer, Vincent McKnight Jr., at Sanford Heisler & Sharp LLC in Washington, DC, to discuss this matter.  He did not answer, so I left him a message requesting his return call.

11. On August 31, 2020, Mr. McKnight returned my call, and I asked him to share

3

whatever details he would disclose to FirstEnergy about any suspected violation of law Mr. Pircio reported to the government, including the identity of the government agency to which he made the disclosure. I recall emphasizing that, if there had been wrongdoing, FirstEnergy wanted to know about it to take corrective action. Mr. McKnight declined my requests for information, explaining vaguely that he wanted to take it "one step at a time" with the government investigators.

12. Prior to filing the Complaint and Motion for TRO, I consulted with counsel experienced in whistleblower litigation to ensure that the lawsuit complied with FirstEnergy's legal obligations. Specifically, although Mr. Pircio was not and never had been an employee of FirstEnergy, I spoke with a partner at Benesch with decades of experience in employment law, including whistleblower disputes. This conversation reinforced my belief that FirstEnergy could properly contest the validity of Mr. Pircio's whistleblower status under the facts and circumstances in the case.

13. On September 1, 2020, I filed the Complaint and Motion for TRO. At the time of the filing, it was unknown and unknowable to me whether the Court would decide the Motion for TRO on an *ex parte* basis. Mr. McKnight was not licensed in Ohio or a member of this Court, and Mr. Pircio had not, to my knowledge, otherwise retained an Ohio-licensed lawyer.

14. At the time of the filing, moreover, I was cognizant of the heightened ethical obligations imposed on lawyers in the context of *ex parte* proceedings. Specifically, I knew that a lawyer representing a client in an *ex parte* proceeding had an affirmative obligation to advise the judge of any adverse material facts the lawyer reasonably believed the judge should know before making a decision. In Ohio, Ohio R. Prof. Cond. 3.3(d) sets forth this mandate.

15. Because of the possibility that the Court could decide the Motion for TRO on an *ex parte* basis, and because I considered Mr. Pircio's assertion of whistleblower status to be a material

4

fact, albeit one that FirstEnergy would vigorously dispute, I determined it was necessary to affirmatively disclose to the Court the fact that Mr. Pircio had asserted whistleblower status under 18 U.S.C. § 1833(b)(1) through Mr. McKnight's letter of August 21, 2020. I didn't think FirstEnergy could ignore the letter. No judge would want to be told about it after granting FirstEnergy a TRO.

16. No one at FirstEnergy directed me to attach a copy of Mr. McKnight's letter to the Complaint. Rather, I recommended doing so based on my professional judgment that if the Motion for TRO was decided *ex parte*, the letter was a material fact that I was required to disclose to the judge. Moreover, even if the Motion for TRO did not proceed *ex parte*, the judge also needed to know that Mr. Pircio had refused (as set forth in Mr. McKnight's letter) Clearsulting's pre-litigation demand that Mr. Pircio delete any confidential information in his possession, and that FirstEnergy would be challenging Mr. Pircio's claim to whistleblower status. Based on that recommendation, in-house counsel for FirstEnergy, Erika Ostrowski, approved filing the Complaint.

17. To reiterate, all the relevant facts known to me at the time the Complaint was filed indicated that Mr. Pircio did not have a good-faith belief that the documents he stole in the hours after he was fired evidenced any suspected violation of law. Those facts consisted of the circumstances under which he took the documents, shortly after being fired; the content of the documents themselves, which appeared to be replete with sensitive materials (e.g., a list of employee salaries and PII); Ms. Engelhardt's testimony that Clearsulting had concluded the work papers he took uniformly validated the effectiveness of FirstEnergy's accounting controls and compliance with Sarbanes-Oxley; and Mr. McKnight's unwillingness to share any details about the nature of any alleged violation Mr. Pircio had reported.

5

18. No one at FirstEnergy ever expressed to me an intent to disclose Mr. Pircio's whistleblower status in order to harass him or for any other improper purpose. Nor, as explained above, did I attach Mr. McKnight's letter to the Complaint to harass him or for any improper purpose. At the time I filed the Complaint, moreover, I was unaware of any legal obligation on FirstEnergy to maintain the confidentiality of his disputed whistleblower claim.

19. On September 1, 2020, immediately after the Complaint and Motion for TRO were filed, I directed John Dagon, a Benesch associate working on the case with me, to email a complete set of the as-filed papers to Mr. McKnight. The email transmitting the filings to him included the Complaint and Exhibit 3 thereto (ECF No. 1-3), which was Mr. McKnight's August 21, 2020 letter to Clearsulting. (*See* Email from J. Dagon to V. McKnight dated September 1, 2020 (attached hereto as Exhibit 1).)

20. On September 2, 2020, at 10:17 AM, Mr. McKnight responded to Mr. Dagon's email. He thanked Mr. Dagon for "sending us copies of these pleadings" and stated that he was discussing with Mr. Pircio "what course of action to take, including whether we will represent him[.]" (*See* Email from V. McKnight to J. Dagon dated September 1, 2020 (attached hereto as Exhibit 2).) Mr. McKnight did not request that his August 21, 2020 letter to Clearsulting be placed under seal or voice any objection to its filing on the public docket. (*Id.*)

21. On September 2, 2020, at 1:27 PM, I received an email from Mr. McKnight's office attaching correspondence from him dated the same day. In his letter, Mr. McKnight stated, among other things, that his firm would not be representing Mr. Pircio in the lawsuit, but was willing to participate in a scheduling conference with the Court. (*See* Email from J. Shapiro to J. Dagon dated September 2, 2020 (attaching letter from V. McKnight to J. Dagon dated September 2, 2020) (attached hereto as Exhibit 3). Neither Ms. Shapiro's email nor Mr. McKnight's letter requested

6

that his August 21, 2020 letter to Clearsulting be placed under seal or voiced any objection to its filing on the public docket. (*Id.*)

22. The case was initially assigned to the Honorable Pamela A. Barker, U.S. District Judge for the Northern District of Ohio. As Mr. McKnight explained in his September 2, 2020 letter, Judge Barker's law clerk had contacted his firm regarding a conference call with the Court to discuss scheduling. (*Id.*) Later that day, on September 2, 2020, at 4:00 PM, the parties had a telephone conference with Judge Barker to discuss scheduling a hearing on the Motion for TRO. The Court's minutes of that telephone conference do not reflect any discussion of whether Exhibit 3 to the Complaint should remain on the public docket or be placed under seal. (ECF No. 6.) The Court's minutes are consistent with my clear recollection that neither Judge Barker nor Mr. McKnight voiced to me any concerns about or objections to the public filing of Mr. McKnight's August 21, 2020 letter.

23. The Court's minutes show that the conference concluded with an agreement by the parties to confer "to determine if an agreement could be reached by and between the parties and incorporated in an order of the Court precluding Defendant Pircio from disseminating the information that is the subject of the Complaint and Plaintiffs' Motion [for TRO] beyond what Attorney McKnight has represented has been the dissemination solely to Attorney McKnight/members of his firm, and the government." (ECF No. 6.)

24. Following the September 2, 2020 telephone conference with the Court, I drafted a Stipulated Injunction that would preclude Mr. Pircio from further disseminating the documents he took and require him to return the copies still in his possession. To avoid any possibility that the injunction could be construed as improperly interfering with a government investigation, I drafted the injunction to expressly permit Mr. Pircio to cooperate with the SEC if the agency happened to

7

see some significance in the documents and wanted to talk to Mr. Pircio about them. Accordingly, the draft Stipulated Injunction attached Mr. McKnight's September 2, 2020 letter, to eliminate any ambiguity that Mr. Pircio could cooperate with the SEC investigators identified therein. FirstEnergy in-house counsel, Erika Ostrowski, reviewed and approved the draft Stipulated Injunction.

25. On September 4, 2020, I emailed the draft Stipulated Injunction to Mr. McKnight for his review and comment. The draft expressly identified his September 2, 2020 letter as an exhibit to the injunction. (*See* Email from G. Phillips to V. McKnight dated September 4, 2020 (attached hereto as Exhibit 4).) Later the same day, Mr. McKnight replied to my email, thanking me for the draft and stating "[w]e are reviewing it now." (*See* Email from V. McKnight to G. Phillips dated September 4, 2020 (attached hereto as Exhibit 5). Mr. McKnight's email did not object to attaching his September 2, 2020 as an exhibit to the injunction, request that it be placed under seal, or otherwise voice any objection to the filing of his letter on the public docket. (*Id.*)

26. If Mr. McKnight had thought including his letters in filings were improper, I have no doubt he would have raised it. Mr. McKnight is the co-chair of Sanford Heisler's Whistleblower and Qui Tam Practice Group based in Washington, D.C. Sanford Heisler is a national employment boutique that holds itself out as having "decades of experience representing whistleblower clients & recovering taxpayer funds." *See https://sanfordheisler.com/whistleblower-lawyers/.*

27. On September 7, 2020, I received correspondence from Laura Hauser indicating that she and Marc Dann were appearing for Mr. Pircio. (*See* Letter from L. Hauser to G. Phillips et al dated September 7, 2020 (attached hereto as Exhibit 6).) Her letter expressed an interest in resolving the Motion for TRO, which was then scheduled for a hearing on September 9, 2020.

8

(*Id.*)  In response,  I forwarded to her a copy of the draft Stipulated Injunction I had previously sent to Mr. McKnight.  (*See* Email from G. Phillips to L. Hauser dated September 7, 2020 (attached hereto as Exhibit 7).)

28. On September 8, 2020, Ms. Hauser emailed me a redlined draft of the Stipulated Injunction.  (*See* Email from L. Hauser to G. Phillips dated September 8, 2020 (attached hereto as Exhibit 8).)  Ms. Hauser's revisions left the reference to Mr. McKnight's September 2, 2020 letter in the draft, but reflected a misunderstanding that the letter had been attached as an exhibit to the Motion for TRO, which was filed the day before the letter.  (*Id.*)  Accordingly, at 3:00 PM the same day, I emailed Ms. Hauser proposed revisions and a comment addressing her misunderstanding.  ((*See* Email from G. Phillips to L. Hauser dated September 8, 2020 (attached hereto as Exhibit 9).)

29. Ms. Hauser and I spoke over the telephone more than once the afternoon of September 8, 2020.  I recall we discussed the logistics of returning the FirstEnergy information Mr. Pircio had taken and stored on a flash drive.  To the best of my recollection, Ms. Hauser did not request that Mr. McKnight's September 2, 2020 letter not be attached to the Stipulated Injunction, nor did she request that either the injunction or the letters be placed under seal.

30. Following our conversation, on September 8, 2020 at 3:33 PM, I emailed Ms. Hauser another draft of the Stipulated Injunction.  (*See* Email from G. Phillips to L. Hauser dated September 8, 2020 (attached as Exhibit 10).)  My email attached a copy of Mr. McKnight's September 2, 2020 letter, and highlighted to Ms. Hauser that it "will be an exhibit" to the Stipulated Injunction.  (*Id.*)

31. In response, on September 8, 2020 at 8:45 PM, Ms. Hauser emailed me her consent to filing the Stipulated Injunction.  (*See* Email from L. Hauser to G. Phillips dated September 8, 2020 (attached hereto as Exhibit 11).)  She wrote: "We approve this form of the Injunction. Feel

9

free to insert "/s/ *Laura A. Hauser*" on the signature line on my behalf." (*Id.*)

32. Accordingly, on September 9, 2020 at 8:10 AM, I filed the parties' proposed Stipulated Injunction signed by counsel of record for all parties, attaching Mr. McKnight's September 2, 2020 as Exhibit A. (ECF No. 10.) About half an hour later, Judge Barker signed the Stipulated Injunction. (ECF No. 11.)

33. On October 30, 2020, I ceased to be counsel of record for FirstEnergy in this case after Judge Barker granted a motion to substitute counsel. The substitution of counsel was for reasons unrelated to the filing of Mr. McKnight's letters with the Complaint and Stipulated Injunction or the Court's subsequent Order to Show Cause.

34. During my two-month involvement in this case from September 1 to October 30, 2020, Judge Barker never expressed any concern to me about the public filing of Mr. McKnight's August 21, 2020 and September 2, 2020 letters. To my knowledge, moreover, none of the lawyers for Mr. Pircio ever requested that FirstEnergy consent to a motion to place them under seal.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 22, 2021.

_____
Gregory J. Phillips